IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES T. STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No.   15-cv-1288-JPG-CJP |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM and ORDER

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Charles T. Stewart seeks judicial review of the final agency decision terminating his Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Stewart applied for both DIB and Supplemental Security Income (SSI) benefits in December 1992.  In 1993, the agency granted his application for DIB, finding that he had been disabled since April 13, 1992.  (Tr. 17, 137.)

Mr. Stewart's claim was reviewed in 1996, and he again was found disabled in June of that year.  (Tr. 17.)  Another continuing disability review was conducted in 2000, and, this time, the agency determined that he was no longer disabled.  (Tr. 137-39, 193.)  However, the agency erroneously continued to pay his monthly DIB payments through September 2004.  (Tr. 17.)  According to the agency, plaintiff was overpaid by $44,801.00.  (Tr. 132.)

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017).  She is automatically substituted as defendant in this case.  *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

On November 3, 2004, Mr. Stewart filed a request for reconsideration, alleging that he had not received the letters informing him of the May 2000 cessation determination.   His request for reconsideration was granted, and further proceedings were held.   After holding an evidentiary hearing, ALJ Helen Cropper issued a written decision in July 2008 finding that his disability had ended as of May 1, 2000.   (Tr. 17-43.)   After the Appeals Council denied review (Tr. 794-96), Mr. Stewart sought judicial review in the Northern District of Illinois, where he then resided.

U.S. District Judge Joan Humphrey Lefkow remanded the case to the agency in July 2012. *Stewart v. Astrue*, No. 09 C 2062, 2012 WL 2994080 (N.D. Ill. July 19, 2012).   A copy of Judge Lefkow's Memorandum and Order is attached hereto.[2]

The claim was then assigned to ALJ Jason Yoder, who held another hearing and determined that Mr. Stewart's disability had ended as of May 1, 2000.   (Tr. 923-36.)   However, the Appeals Council remanded the case, finding the ALJ did not fully comply with Judge Lefkow's remand order.   (Tr. 941-42.)   ALJ Yoder held another hearing.   In a written decision dated September 16, 2015, he found that Mr. Stewart had experienced medical improvement such that he was no longer disabled as of May 1, 2000.   He also found that plaintiff had not again become disabled as of his date last insured for DIB, September 30, 2004.[3]   (Tr. 732-47.)   As the Appeals Council did not assume jurisdiction, the September 16, 2015, decision became the final agency decision now subject to judicial review.

Plaintiff has exhausted administrative remedies and has filed a timely complaint.

---

[2] References to Judge Lefkow's Order will cite to the page number as assigned by Westlaw.

[3] The Court assumes that plaintiff's application for SSI was denied at the time he was awarded DIB.   There is no explanation in the record of why the SSI application is not still in issue.   However, plaintiff does not argue with the proposition that the period of time relevant to this case runs only to his date last insured for DIB, September 30, 2004. The record does not indicate whether Mr. Stewart filed a subsequent application for SSI in the ensuing years.

**Issues Raised by Plaintiff**

Plaintiff raises the following issues:

(1)     The ALJ failed to follow Judge Lefkow's remand decision.

(2)     The ALJ's assessment of plaintiff's physical residual functional capacity (RFC) was not supported by substantial evidence.

(3)     The ALJ failed to properly accommodate plaintiff's limitations in maintaining concentration, persistence or pace.

(4)     The ALJ's assessment of the opinion evidence regarding plaintiff's mental impairments lacks substantial support.

**Applicable Legal Standards**

In order to receive DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   "Substantial gainful activity" (SGA) is defined as work activity that involves doing significant physical or mental activities and that is done for pay or profit.   Work may be substantial even if it is done on a part-time basis.   20 C.F.R. § 404.1572.

Once a claimant has been awarded benefits, the agency undertakes a periodic review of continued eligibility to receive benefits.   20 C.F.R. §§ 404.1589, 404.1594(a).   Social Security regulations set forth a sequential eight-step inquiry to determine whether a claimant is under a continuing disability.   The eight steps are set forth in 20 C.F.R. § 404.1594(f):

1. Is the beneficiary engaging in substantial gainful activity?   If yes (and there is no issue of a trial work period), the beneficiary is no longer disabled.

2. If the beneficiary is not engaging in substantial gainful activity, does his impairment or

combination of impairments meet or equal the Listings?   If yes, disability is continued.

3.  If the beneficiary's impairments do not meet or equal the Listings, has there been medical improvement?   If yes, the sequential analysis proceeds to step four; if no, it proceeds to step five.

4.  Is the medical improvement related to the beneficiary's ability to work, *i.e.*, has there been an increase in the RFC?   If yes, the sequential analysis proceeds to step six; if no, it proceeds to step five.

5.  If there is no medical improvement, or if the medical improvement is not related to the beneficiary's ability to work, does one of the exceptions to medical improvement apply?   If the exception does apply, the beneficiary is no longer disabled.   If none of the exceptions apply, the sequential analysis continues.

6.  If medical improvement is related to the ability to work, are all current impairments severe in combination?   If not, the beneficiary is no longer disabled.

7.  If the impairments are severe, the Commissioner determines the beneficiary's RFC, and considers whether he can do his past work.   If the beneficiary can do his past work, disability will be found to have ended.

8.  If the beneficiary cannot do his past work, the Commissioner decides whether he can do other work given his RFC, and considering his age, education, and past work experience.   If the beneficiary can do other work, he is no longer disabled; if not, disability is continued.

The continuing disability determination is to be made "on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition" and on a "neutral basis . . . without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."   42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(b)(6).

Medical improvement is any decrease in the medical severity of the beneficiary's impairment; the determination is based on improvement in symptoms, signs and/or laboratory findings.   20 C.F.R. § 404.1594(b)(1).   Medical improvement is related to ability to work if there has been a decrease in the severity of the impairment(s) *and* an increase in the functional capacity

-4-

to do basic work activities.   20 C.F.R. § 404.1594(b)(3).   The comparison point is the time of the most recent favorable medical decision that the individual was disabled or continued to be disabled.   20 C.F.R. § 404.1594(b)(7).   In this case, the comparison point used by the ALJ was June 17, 1996, the date of the most recent favorable decision that plaintiff was disabled.   (Tr. 734.)

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."   42 U.S.C. § 405(g).   Thus, the question before the Court is not whether Mr. Stewart continued to be disabled as of the relevant date; rather, this Court must determine whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).   This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   The reviewing court cannot "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."   *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920,

-5-

921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Yoder undertook the eight-step analytical process described above.   He determined that, as of the comparison point decision, Mr. Stewart had medically determinable impairments of history of personality disorder and ulnar shaft fracture.   He had not engaged in substantial gainful activity through May 1, 2000.   As of May 1, 2000, he had medically determinable impairments of low back syndrome, status-post low back injury in 1992; healed fractures of the right upper extremity and fracture of the left distal radius/ulnar styloid; hypertension; cardiac impairment; osteoporosis; history of post-traumatic stress disorder, stable; personality disorder, not otherwise specified; major depression; anxiety disorder, not otherwise specified; and a history of alcohol abuse.   The ALJ determined that his impairments did not meet or equal a listed impairment.

At steps three and four, the ALJ determined that there had been medical improvement and that such improvement was related to plaintiff's ability to work.   Proceeding to step six, he determined that plaintiff's impairments as of May 1, 2000, were severe.   He determined that plaintiff had the RFC to perform a limited range of work at the sedentary level.   He had no past relevant work.[4]   At step eight, relying on the testimony of a vocational expert, the ALJ concluded that plaintiff could perform jobs such as inspection/tester and machine tender.   He further determined that plaintiff had not again become disabled between May 1, 2000, and his date last insured, September 30, 2004.

## The Evidentiary Record

The state of the administrative transcript made review of the record an unusually burdensome task in this case.   Because of its age, the claim file started out as a paper, rather than

---

[4]  Past relevant work refers to work done in the fifteen years before the time of the decision or the date last insured, whichever is earlier.   20 C.R.F. § 404.1565(a).

electronic, file.   In preparing the transcript for electronic filing in the Court's file, almost every page of the record was duplicated, and the record as filed in CM/ECF is broken into 87 segments, many of them consisting of only a few pages.   Further, the "supplemental transcript" filed at Doc. 19 inexplicably contains more than 1000 pages that are duplicates of pages that were filed with the original transcript at Doc. 15; and, the "index" prepared by the agency, located at Doc. 15, pp. 5-29 and Doc. 19, pp. 2-13, is almost useless.   Nevertheless, the Court has reviewed and considered the entire record.

**1.     <u>Prior Favorable Decision</u>**

The most recent favorable decision, or "comparison point decision," was dated June 20, 1996.   According to ALJ Yoder, Mr. Stewart was found to be disabled at that time on the basis of history of personality disorder and ulnar shaft fracture.   (Tr. 734.)   It does not appear that a copy of the actual 1996 decision is included in the administrative transcript.

**2.     <u>Evidentiary Hearings</u>**

ALJ Yoder conducted two evidentiary hearings.   Plaintiff was represented by an attorney at both hearings.   Plaintiff's testimony at these hearings is of limited relevance because it is difficult to discern whether plaintiff was talking about his condition at the time of the hearing or at the time of his date last insured.

Plaintiff was 53 years old at the time of the February 2014 hearing.   (Tr. 1085.)   He testified that his back was injured when he was hit by a forklift at work in 1991 and that his back had gotten consistently worse since then.   (Tr. 1082.)   The pain radiated into his right leg.   (Tr. 1084.)   He fell off of a roof in 2002.   (Tr. 1109.)   He was shot in his left hand and broke his wrist.   He did not have a strong grip in the left hand and was unable to close his hand into a fist.

He also had problems with his right hand.   (Tr. 1110-12.)

Mr. Stewart testified about problems with concentration and in getting along with other people.   (Tr. 1117-19.)

The second hearing was held in August 2015, after the Appeals Council remand.   (Tr. 1030.)

Mr. Stewart testified that he was shot in the left hand in 1987 or 1988.   His little finger was injured.   Since then, he had decreased grip in his left hand and could not make a fist.   (Tr. 1038-40.)   He had surgery on the left hand in 2003.   (Tr. 1052.)   His right wrist was broken when he fell off a roof around 2000.   (Tr. 1044-45.)

A vocational expert (VE) also testified.   The ALJ asked the VE to assume a person who could do sedentary work, sitting for 6 out of 8 hours and standing and/or walking for 2 out of 8 hours, limited to no climbing of ladders, ropes or scaffolding and no working on uneven surfaces; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; frequent but not constant use of the bilateral upper extremities for handling, fine fingering, pushing/pulling, and operating hand controls; and no exposure to hazards such as moving machinery and unprotected heights.   Mentally, he was limited to simple instructions and carrying out simple, routine tasks; work in a stable setting with little change in tools used or processes employed, and in the setting itself, with necessary change introduced gradually; and only occasional interaction with the public, coworkers, and supervisors.   The VE testified that this person could do the jobs of unskilled inspector/tester and machine tender.   (Tr. 1056-60.)

The VE also testified that, if the person were limited to only occasional, as opposed to frequent, use of the left upper arm, he would be unable to do either of the jobs he had identified.

-8-

He testified that unskilled work at all exertional levels generally requires at least frequent use of both hands.  (Tr. 1060.)

On cross-examination, the VE testified that these jobs require the worker to be on-task at least 90 percent of the time.

**3.**   **Medical Records**

Judge Lefkow summarized the medical records in detail in her Memorandum and Order dated July 19, 2012.  Rather than repeat all of that information, the Court refers the reader to Judge Lefkow's Memorandum and Order, a copy of which is attached hereto.

At page 2 of her Order, Judge Lefkow states that plaintiff was struck by a forklift at work in December 1991, and was hospitalized thereafter for 18 months.   This Court is unable to locate any medical record indicating an 18 month hospitalization.   Plaintiff filed a Worker's Compensation claim arising from that injury.   The records of that claim indicate he was released for light duty in February 1992, suggesting that he was not, in fact, hospitalized for 18 months.  (Tr. 341.)   His claim was settled in December 1993 for a total of $22,141.00, representing 17.5% disability of the person as a whole.  (Tr. 339.)

Judge Lefkow also pointed out that plaintiff "reportedly" underwent back surgery in December 1992, citing to Tr. 46, which is a letter from his then-attorney stating that he "had back surgery in December 1992."   Judge Lefkow noted that a medical history prepared in 2004 stated that surgery was recommended but not done.

The transcript does not contain any medical records documenting back surgery in December 1992.   In his brief, plaintiff does not claim to have undergone back surgery.   He cites to a number of pages in the transcript in support of his claim that, as a result of being hit by a

forklift, he "suffered severe back injuries which required extensive hospitalization."   *See* Doc. 21, p. 3.   However, most of those citations are to plaintiff's own statements; none are to medical records documenting "extensive hospitalization."   In fact, there are no medical records documenting "extensive hospitalization" following the forklift incident.

Dr. Rama Embar performed a consultative psychological exam in March 2000.   She reported that plaintiff told her that he was hit by a forklift at work and "was in the hospital for 18 months."   There was no notation that plaintiff claimed to have had back surgery.   He was not in psychiatric care or therapy, and denied any history of psychiatric hospitalization or medication. He was "angry and hostile regarding his accident and his situation."   The diagnosis was post-traumatic stress disorder and rule out chronic depressive disorder.   (Tr. 209-11.)

Dr. Hilton Gordon performed a consultative physical exam in March 2000.   Dr. Gordon stated that plaintiff said that he was told that x-rays taken after the forklift accident were normal and he went to physical therapy for a while.   He did not tell Dr. Gordon that he had been hospitalized for 18 months.   Dr. Gordon did not note any back surgery in the past medical history. On exam, he noted no lumbosacral tenderness or paravertebral muscle spasm.   Flexion was 60/90 degrees and extension was 10/30, with pain.   Straight leg raising was positive at 40 degrees bilaterally.   There was slight tenderness at the left 5th finger, which had an old surgical scar.   He was unable to completely flex or extend that finger.   Fist and grip strength were 5/5 bilaterally. Plaintiff was able to grasp, finger, and manipulate with both hands.   Motor strength was full. Sensation was intact.   Plaintiff's gait was normal and he did not need a cane to ambulate.   The impression was low back syndrome and status-post fracture of the left 5th finger with bone graft. (Tr. 213-17.)

-10-

Dr. Dominic Gaziano performed a consultative physical exam in July 2004. In the medical history portion of his report, he noted that surgery was recommended after plaintiff's back injury but was not done. Plaintiff complained of weakness and sometimes numbness in both legs. He had a history of a bone graft for a fractured left 5th finger in 1987, and he complained of difficulty buttoning, zipping and picking up coins with that hand. He had surgery on his right wrist in 2003, and complained of right wrist pain. On exam, Dr. Gaziano noted that plaintiff walked slowly with short steps. He was not able to toe or heel walk. He could squat 1/5 of the way to the floor. Lumbosacral flexion was limited to 40 degrees and extension was limited to 10 degrees, with pain. Straight leg raising was negative. Grip strength was reduced to -4/5 on the left and +4/5 on the right. He had difficulty buttoning and zippering bilaterally and he had "slow, alternating movements bilaterally." Under clinical impressions, Dr. Gaziano noted "bilateral hand dexterity difficulties, more significant in the left hand than the right hand." He also noted "difficulties using his right hand, with right wrist weakness, status-post surgery in 2003 at Loyola Hospital." An x-ray of the lumbosacral spine was negative. (Tr. 218-24.)

Mr. Stewart returned to Dr. Joel Press, at the Rehabilitation Institute of Chicago, in November 2004. Dr. Press had treated him in the past for his back injury. On exam, his gait was tandem and he was able to toe and heel walk. He had no focal motor weakness, sensory deficit or reflex changes. Straight leg raising was negative. He was "pretty tender to touch almost everywhere in this back." The impression was chronic low back pain without neurologic deficit. Dr. Press recommended that he continue to stay active and use biofeedback. He was to use anti-inflammatories only on an as-needed basis. (Tr. 409-10.)

Dr. Helena Radomska performed a consultative psychological exam in July 2004.

Plaintiff said that he had attended group therapy for 18 months from 1992 to 1994.   He denied any other anti-depressant or psychiatric treatment.   His mood was normal, and speech was spontaneous with normal rate and rhythm.   He had no formal thought disorder and no hallucinations.   Dr. Radomska diagnosed history of post-traumatic stress disorder, currently stable, and history of alcohol abuse, currently sober.   She assessed his GAF at 60.   (Tr. 225-29.)

On August 31 and September 1, 2005, Dr. Louis Hemmerich performed psychological testing at the request of plaintiff's then-attorney.   Plaintiff told Dr. Hemmerich that he was in psychiatric care for about 18 months in 1992 to 1993 and that he was treated for stress and depression.   He said he was prescribed psychotropic medication.   He said he had a history of substance abuse treatment but had not used any alcohol for the past 2 years.   His speech was fluent but slightly pressured at times.   He was upset and expressing concerns about how his case had been mismanaged by social security.   He felt financial pressures and said he might wind up homeless soon.   He was oriented and denied any disturbances in thought processes.   He had no delusions or hallucinations.   He often appeared depressed.   He was able to recall past events, suggesting "no disturbance in short or remote memory."   Dr. Hemmerich diagnosed major depression, generalized anxiety disorder, and personality disorder, NOS.   He opined that plaintiff had "a serious disturbance in emotional and psychological functioning manifested primarily by marked depression and some anxiety."   He predicted that plaintiff would not be able to complete a normal workday and workweek without interruptions from his emotional and psychological problems, and he would not be able to meet the demands and pressures of competitive work.   He also stated that plaintiff's inability to tolerate work stress dates back to 2000, and even earlier. (Tr. 249-56.)   Dr. Hemmerich opined that plaintiff met the requirements of Listings 12.04

-12-

Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.08 (Personality Disorders).   (Tr. 257-65.)

Plaintiff's then-attorney requested another psychological evaluation from Dr. Dianne Stevenson in December 2007.   Dr. Stevenson diagnosed schizoaffective disorder, depressive type, and schizoid personality disorder, NOS with paranoid features.   She assessed his GAF at 55. She opined that he would have difficulty maintaining a workplace routine and would be unable to perform work related to tasks that require concentration and attention to details or sustained efforts.   She said he was at significant risk for suicidal ideation and gesture, and recommended he be evaluated for antipsychotic medication.   According to Dr. Stevenson, plaintiff met the requirements of Listings 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders) and 12.08 (Personality Disorders).   (Tr. 312-33.)

**4.     State Agency Consultant Mental RFC Assessment**

In January 2005, L.M. Hudspeth, Psy.D., completed a Psychiatric Review Technique Form.   In considering whether the "B criteria" of the listings were met, Dr. Hudspeth indicated that plaintiff had moderate limitations in the areas of maintaining social functioning, and maintaining concentration, persistence or pace, and mild limitations in activities of daily living. (Tr. 234-39.)

Dr. Hudspeth assessed plaintiff's mental RFC using an agency form (Form SSA-4734-SUP) that is commonly used for this purpose in social security cases.   (Tr. 230-33.) This form is referred to as the Mental Residual Functional Capacity Assessment.   Section I of the form consists of a list of mental activities.   The consultant is asked to set forth his "summary conclusions" by checking a box to rate the severity of limitation as to each activity.   The levels of

-13-

severity are (1) not significantly limited, (2) moderately limited, (3) markedly limited, (4) no evidence of limitation in this category, and (5) not ratable on available evidence.

Dr. Hudspeth checked the box for "moderately limited" in ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to interact with the general public, and ability to accept instructions and respond appropriately to criticism from supervisors.   He checked the box for not significantly limited in all other areas, including ability to maintain attention and concentration for extended periods.   In the section of the form for narrative remarks, Dr. Hudspeth wrote that Mr. Stewart had a history of personality disorder diagnosed in 1992.   He "has moderate social/interpersonal difficulties but is capable of cooperating and relating in a simple job situation.   He could adapt in such a job.   He could perform unskilled work."

## Analysis

Plaintiff's first point requires little discussion.

The hypothetical question posed to the VE in the case before Judge Lefkow assumed a person who could do work at the light exertional level, with some physical limitations but no mental limitations.   The physical limitations did not include any limitations in the use of the arms or hands.   Judge Lefkow Order, at *13.   Judge Lefkow found that the hypothetical question was erroneous:

> This recital demonstrates that the ALJ did not include any mental impairments in her hypotheticals.   Neither does the decision acknowledge that a mental impairment need not be "marked" (as opposed to moderate or minimal) in order to qualify as severe.   See *Craft*, 539 F.3d at 675, C.F.R. § 404.1520a(d)(1), and note 4, supra.   Thus, a proper hypothetical should have included the specific limitations cited by the psychologists on which she relied.   The same can be said for the ALJ's failure in her hypothetical to include the documented history of lower back pain (albeit at times exaggerated by him), arm and finger pain, limited lumbar flexibility and the disabled finger.   Light work may involve sitting most of the time with

> some pushing and pulling of arm or leg controls.   Such skills could be affected by
> these physical impairments.   Thus, the court will remand this case for a fuller
> inquiry of the VE as to Stewart's combined physical and mental RFC.

Judge Lefkow Order, at *13.

Plaintiff's argument assumes that Judge Lefkow ordered the ALJ to include specific

limitations in the hypothetical question on remand.   This is incorrect.   Given the limited scope of

judicial review, Judge Lefkow did not (and could not) weigh the evidence herself and decide what

limitations should be included in the hypothetical question.   Rather, she ordered, "This case is

remanded to the Commissioner for the limited purpose of obtaining additional opinion testimony

from a vocational expert, reconsideration of plaintiff's residual functional capacity, and a

redetermination of continued eligibility in light of the additional evidence."   Judge Lefkow Order,

at *13.   On remand, ALJ Yoder reconsidered plaintiff's mental and physical residual functional

capacity, which is what the remand order required.

Plaintiff's fourth point regarding the weighing of the opinions regarding his mental

impairments also requires little discussion.   Plaintiff argues here that the ALJ erred in rejecting

the opinions of Drs. Hemmerich and Stevenson, who examined him in September 2005 and

December 2007, respectively.

The ALJ was required to weigh the medical opinions applying the factors set forth in 20

C.F.R. § 404.1527.   Neither of these two psychologists treated plaintiff, so their opinions are not

entitled to controlling weight under that regulation.   ALJ Yoder rejected Dr. Hemmerich's

opinion because a person with the limitations assigned by Dr. Hemmerich would be unable to do

the activities that plaintiff testified he routinely performed, and because the sparse mental health

treatment was not consistent with the severity of symptoms found by Dr. Hemmerich.   He

-15-

rejected Dr. Stevenson's opinions for the same reasons, plus the fact that her examination took place more than 3 years after plaintiff's date last insured.

Plaintiff's argument here is extremely weak.   He suggests that the ALJ's rejection of Dr. Hemmerich's opinion "highlights the ALJ's apparent misunderstanding that significant mental limitations or mental disability is appropriate only in those cases in which someone would be institutionalized."   Doc. 21, p. 19.   The Court disagrees; ALJ Yoder's decision in no way indicates that he labored under such a misunderstanding.   He also argues that the ALJ failed to consider fluctuations in plaintiff's mental condition.   However, there is no evidence of any such fluctuations here, which distinguishes the case relied on by plaintiff, *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

Plaintiff also argues that the ALJ erred in dismissing Dr. Stevenson's opinion because she did not examine plaintiff until long after his date last insured.   He points out that medical evidence after the date last insured can be relevant to plaintiff's condition during the insured period.   That is true as a general proposition, but Dr. Stevenson's report does not indicate that she believed that plaintiff suffered from the limitations she assigned before September 30, 2004.   Plaintiff also argues that Dr. Stevenson's opinion was consistent with and supported Dr. Hemmerich's opinion. That is patently false: the two psychologists gave different diagnoses and opined that plaintiff met different Listings.

Plaintiff does not argue here that the ALJ erred in failing to find that he met the requirements of a mental listing.   The failure to make that argument undermines the strength of his claim that the opinions of Drs. Hemmerich and Stevenson should have been afforded more weight.   These two examining doctors found extreme, listing level limitations in a case where

there is virtually no psychiatric treatment and little complaint by plaintiff of mental symptoms. The bottom line is that an ALJ can properly reject a medical opinion if it is inconsistent with other substantial evidence in the record so long as he explains his reasons for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The ALJ sufficiently explained his reasons for rejecting the opinions of Drs. Hemmerich and Stevenson.

Plaintiff's other two arguments have more traction. With regard to his mental RFC, he argues that the ALJ failed to account for his moderate limitation in maintaining concentration, persistence or pace, even though the ALJ found he had such a limitation at step two. (Tr. 737.)

The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all of the limitations that are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. *See Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE; in most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010).

Here, the ALJ found that Mr. Stewart had moderate difficulties in maintaining concentration, persistence or pace. (Tr. 737.) However, neither the hypothetical question posed to the VE nor the RFC assessment mentioned a limitation in concentration, persistence or pace. Rather, the ALJ limited him to simple instructions and simple routine tasks, in a setting requiring little adaptation. He explained that these limitations were designed to accommodate plaintiff's "complaints of pain in [sic] the claimant's above-mentioned PTSD." (Tr. 745.)

-17-

It is unclear why the ALJ found that plaintiff was moderately limited in concentration.   He certainly was not required to make such a finding on this record.   The ALJ said that he gave "considerable weight" to Dr. Hudspeth's opinion, but Dr. Hudspeth did not assign such a limitation in the mental RFC assessment.   (Tr. 744.)   However, having found that plaintiff had a moderate limitation in maintaining concentration, persistence or pace, the ALJ was required to account for it in accordance with the cases cited above.

The Court also agrees that the RFC assessment as to plaintiff's ability to use his arms was not supported by substantial evidence.

Citing *Suide v. Astrue*, 371 F. Appx. 684 (7th Cir. 2010), plaintiff argues that the ALJ created an "evidentiary deficit" by rejecting all of the medical opinions and then relying on his own independent medical determination regarding plaintiff's ability to use his hands.   The agency refers to the ability to "seize, hold, grasp, or turn an object" as "handling."   SSR 85-15, 1985 WL 56857, at *2.   Here, the ALJ determined that plaintiff was able to frequently, rather than occasionally, handle objects with both of his hands.

*Suide* does not stand for the proposition that an ALJ's RFC assessment must rest upon a healthcare provider's opinion.   The rule is, in fact, to the contrary.   The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ."   *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).   The determination of RFC is an administrative finding that is reserved to the Commissioner.   20 C.F.R. § 404.1527(d)(2).   The error in *Suide* was not that the ALJ did not rely on a doctor's opinion to assess RFC; rather, the error was that the ALJ failed to discuss significant medical evidence in the record.   *Suide*, 371 Fed. Appx. at 690.   Here, plaintiff does not point to any

-18-

significant medical evidence that was ignored by the ALJ.[5]

However, the Court agrees with plaintiff's argument that the ALJ made his own independent medical assessment of his ability to handle objects, and failed to build the required "logical bridge" between the evidence and his conclusion.

The ALJ did not explain the basis for his conclusion that plaintiff was limited to frequent, as opposed to occasional, handling.   The agency defines occasional as "occurring from very little up to one-third of the time."   Frequent is defined as "occurring from one-third to two-thirds of the time."   SSR 83-10, 1983 WL 31251, *5-6.

The ALJ did not explain why he believed that a limitation to frequent, rather than occasional, handling was appropriate.   It is true that the ALJ summarized the medical records with respect to plaintiff's upper extremity complaints, but he did not explain how this evidence supported the limitation that he assessed.   The ALJ noted that Dr. Gaziano, who examined plaintiff on behalf of the agency, found bilateral hand dexterity difficulties, more significant on the left, and difficulties using the right hand with right wrist weakness.   The ALJ declined to give significant weight to Dr. Gaziano's assessment because he deemed it to be incomplete and vague. With regard to his manipulative limitations, the ALJ faulted Dr. Gaziano for failing to indicate what plaintiff is capable of doing.   (Tr. 743.)

Dr. Gaziano examined plaintiff at the request of the agency.   Therefore, he was unlikely to exaggerate plaintiff's disability.   *Garcia v. Colvin,* 741 F.3d 758, 761 (7th Cir. 2013).   The ALJ obviously accepted that Mr. Stewart had some degree of limitation in using his upper extremities, but he failed to explain why he found him capable of frequent, rather than occasional, handling, fine fingering, pushing/pulling and operating hand controls.   This was error.   *See Scott v. Astrue,*

---

[5] Much of plaintiff's argument is based on his own subjective complaints.   However, the ALJ found that plaintiff was not entirely credible, and plaintiff has not challenged the credibility finding.

647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities . . . .").

The difference between frequent and occasional use of the arms and hands is potentially dispositive in this case.  According to the VE's testimony, if plaintiff were limited to only occasional, as opposed to frequent, use of the left upper arm, he would be unable to do either of the jobs the VE had previously identified.   Plaintiff is limited to unskilled work, and the VE testified that unskilled work at all exertional levels generally requires at least frequent use of both hands. (Tr. 1060.)

Because of the ALJ's errors in determining plaintiff's mental and physical RFC, this case must be remanded.  "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *see also Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.")

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Stewart was disabled during the relevant period or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

<u>**Conclusion**</u>

The Commissioner's final decision denying Charles T. Stewart's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

-20-

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   February 27, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**

-21-